**Tyrone Blackburn, ESQ**
**Attorney NJS-ID # 232602020**
**1242 East 80th Street, 3rd Floor**
**Brooklyn, NY 11236**
**(347) 342-7432**
*Counsel for Plaintiff's*

---

ERIK HILDEBRANDT,
PAUL CHRISTIAN BURK,
LAINA DUTTON,
LAWRENCE LAMAINA,
SAMANTHA LIBBY,
VIRGINIA LEE,
EFTHIMIOS MARIAKAKIS,
MICHAEL MCDONOUGH,
LINDSEY FORBUS,
EDWARD DIX,
PETER FRANZONE,
JOHN BERRY,
RYAN MILLER,
HANK SWANK,
JOHN FERRAZZA,
CHARLES TAYLOR,
AJ HOLDERMAN, and
*A class of similarly situated individuals*
                         Plaintiff,

                                                UNITED STATES DISTRICT COURT
                                                FOR THE DISTRICT OF NEW JERSEY

                                                DOCKET NO. 24-265
                                                <u>**Civil Action**</u>
              -against-                          **JURY DEMAND**
                                                .

SIPARADIGM DIAGNOSTICS INFORMATICS,
HEALTH LYNKS, LLC.
MOHAMMED KHAN,
AZIZ SAAD,
CHRIS WEIDMAN,
JOHN and JANE DOES 1-10,
and ABC CORPS. 1-10;

---

Plaintiff's Paul Christian Burk ("Mr. Burk"), Laina Dutton ("Ms. Dutton"), Lawrence LaMaina
("Mr. LaMaina"), Samantha Libby ("Ms. Libby"), Virginia Lee ("Ms. Lee"), Efthimios ("Tim")
Mariakakis ("Mr. Mariakakis"), Michael McDonough ("Mr. McDonough"), Lindsey Forbus ("Ms.
Forbus"), Edward Dix ("Mr. Dix"), Peter Franzone ("Mr. Franzone"), John Berry ("Mr. Berry"),

Ryan Miller ("Mr. Miller"), Hank Swank ("Mr. Swank"), John Ferrazza ("Mr. Ferrazza") Charles Taylor ("Mr. Taylor"), and AJ Holderman ("Mr. Holderman"), collectively, "the collective," by way of Complaint against Defendant's, siParadigm diagnostics informatics ("siP" or "Defendant Corporation"), Aziz Saad ("Saad" or "Defendant Saad"), Mohammed Khan ("Khan" or "Defendant Khan"), Chris Weidman, ("Defendant Weidman" "Mr. Weidman"), and JOHN and JANE DOES 1-10, and ABC CORPS. 1-10, hereby alleges and says:

## PARTIES

1. _Mr. McDonough_: Mr. McDonough is a Caucasian man with a bachelor's in science in Geography from The State University of New York at Buffalo. Mr. McDonough was employed at Defendant Corporation as a Business Development Executive.  Mr. McDonough has 18 years of Business Development Sales expertise, previously Territory Manager at Johnson & Johnson.  Mr. McDonough was more than qualified for his position with Defendant corporation.

2. _Mr. Holderman_: Mr. Holderman is a Caucasian man.  Mr. Holderman was employed at Defendant Corporation as a Hereditary Cancer Specialist, Oncology and has over ten years of experience in this position.  Mr. Holderman was more than qualified for his position with Defendant corporation.

3. _Mr. Mariakakis_: Mr. Mariakakis is a Caucasian man. Mr. Mariakakis was employed at Defendant Corporation as a sales executive.  Mr. Mariakakis has over ten years of sales executive experience.  Mr. Mariakakis was more than qualified for his position with Defendant corporation.

4. _Ms. Lee_: Ms. Lee is a Caucasian woman with a Bachelor of Science in Business Journalism/Advertising from the University of Mississippi.  Ms. Lee was employed at Defendant Corporation as a Senior Oncology Sales Specialist.  Ms. Lee has 20 years of sales and corporate account management expertise, previously Director, Corporate Accounts Caris Life Sciences.  Ms. Lee was more than qualified for her position with Defendant corporation.

5. _Ms. Libby_:  Ms. Libby is a Caucasian woman with eight years of Medical Sales expertise and over 15 years of B2B sales and marketing experience. Ms. Libby was employed at Defendant Corporation as a Business Development Executive.  Ms. Libby was more than qualified for her position with Defendant corporation.

6. _Mr. LaMaina_: Mr. LaMaina is a Caucasian man. Mr. LaMaina was employed at Defendant Corporation as a territory sales manager and has over ten years of territory sales experience. Mr. LaMaina was more than qualified for his position with Defendant corporation.

7. _Ms. Dutton_: Ms. Dutton is a 51-year-old Caucasian woman. Ms. Dutton was employed at Defendant Corporation as a knowledgeable territory sales manager and has over ten years of experience in the position of a molecular oncology specialist. Ms. Dutton was more than qualified for her position with the Defendant corporation.

8. _Mr. Taylor_: Mr. Taylor is an African American man. Mr. Taylor was employed at Defendant Corporation as an Oncology Sales Specialist. Mr. Taylor has over ten years of oncology sales specialist experience. Mr. Taylor was more than qualified for his position with the Defendant corporation.

9. _Ms. Forbus_: Ms. Forbus is a Caucasian woman. Ms. Forbus was employed at Defendant Corporation as an oncology sales manager. Ms. Forbus has over ten years of oncology sales management experience. Ms. Forbus was more than qualified for her position with Defendant Corporation.

10. _Mr. Swank_: Mr. Swank is a Caucasian man. Mr. Swank was employed at Defendant Corporation as a Business Development Executive. Mr. Swank has over ten years of experience. Mr. Swank was more than qualified for his position with the Defendant corporation.

11. _Mr. Miller_: Mr. Miller is a Caucasian man. Mr. Miller was employed at Defendant Corporation as a Business Development Sales executive and has over ten years of experience in the position. Mr. Miller was more than qualified for his position with the Defendant corporation.

12. _Mr. Franzone_: Mr. Franzone is a Caucasian man. Mr. Franzone was employed at Defendant Corporation as a business developer. Mr. Franzone has over ten years of business development experience. Mr. Franzone was more than qualified for his position with the Defendant corporation.

13. _Mr. Burk_: Mr. Burk is a Caucasian man with a bachelor's degree in public policy and management from Indiana University Bloomington, IN. Mr. Burk was employed at Defendant Corporation as a Region Account Manager. Mr. Burk has 27 years of account/managerial expertise, previously Director level Caris Life Sciences. Mr. Burk was more than qualified for his position with Defendant corporation.

14. _Mr. Hildebrandt_: Mr. Hildebrandt is a Caucasian man.  Mr. Hildebrandt was employed at Defendant Corporation as a regional account sales manager.  Mr. Hildebrandt has over ten years of experience.  Mr. Hildebrandt was more than qualified for his position with the Defendant corporation.

15. _Mr. Dix_: Mr. Dix is a Caucasian man.  Mr. Dix was employed at Defendant Corporation as an Oncology Sales Specialist and has over ten years of experience in the position.  Mr. Dix was more than qualified for his position with the Defendant corporation.

16. _Mr. Berry_: Mr. Berry is a Caucasian man.  Mr. Berry was employed at Defendant Corporation as a Precision Oncology Specialist.  Mr. Berry has over ten years of precision oncology sales experience.  Mr. Berry was more than qualified for his position with Defendant corporation.

17. Health Lynks, LLC is a shell organization set up in Wyoming by Defendants to bury their assets and escape liability from possible litigation such as this.  According to the Wyoming Secretary of State, Health Lynks, LLC initial filing date was December 12, 2019.  They are currently active.  Health Lynks, LLC's registered agent is Cloud Peak Law Group, P.C. located at 1095 Sugar View Dr. Ste 100, Sheridan, WY 82801.  Health Lynks, LLC has a principal address located at 1309 Coffeen Avenue, Ste 1200 Sheridan, WY 82801.



**Defendant Mohammed Khan**

18. Defendant Mohammad Khan is the CEO of Defendant siParadigm.  Defendant Khan resides in Clarksville, Maryland.  Defendant Khan aided, abetted, instructed, and authorized the harm visited upon Plaintiffs as detailed herein.



**Defendant Aziz Saad**

19. Defendant Aziz Saad is a senior officer of Defendant siParadigm. Defendant Aziz aided, abetted, instructed, and authorized the harm visited upon Plaintiffs as detailed herein.



**Defendant Chris Weidman**

20. Defendant Weidman is a senior officer of Defendant siParadigm. Defendant Weidman aided, abetted, instructed, and authorized the harm visited upon Plaintiffs as detailed herein. Specifically, Mr. Weidman is a married man and used his position and power to sexually harass his female employees, specifically Ms. Forbus.

<u>**JURISDICTION AND VENUE**</u>

21. The venue is properly set in Essex County because Defendants conduct business there.

22. This Court has personal jurisdiction over Defendants according to and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

    i.   The transaction of any business within the state;

    ii.   The making of any contract within the state;

    iii.   The commission of a tortious act within this state; and

    iv.   The ownership, use, or possession of any real estate in this state.

23. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiff's claims arise from conduct occurring by Defendants in New Jersey.

24. Defendants and Plaintiffs have complete diversity as detailed in the above.

25. The amount in controversy is above the $75,000.00 threshold for diversity cases.

## CLASS ACTION ALLEGATIONS

26. Plaintiffs bring this class action on their own behalf and on behalf of all similarly situated individuals (the "Class"), under the provisions of Rule 23(a) and 23(b)(3) who:

> Worked for Defendant Corporation and had their employment contracts breached by defendants, and who was retaliated against by defendants in violation of New Jersey's Conscientious Employee Protection Act.

Excluded from this above Class are: (1) Defendant, including its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (2) any entity in which Defendant has a controlling interest, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (3) judicial and governmental entities including any judge, justice, or judicial officer presiding over this matter and members of their staff and immediate families; and (4) any person or company, which has negotiated and entered into employment agreements with Defendant that failed to adhere to the terms and conditions agreed to within the employment agreements.

27. Plaintiffs reserve the right to amend the above Class definition if further investigation indicates that the Class definition should be expanded, narrowed, subdivided, or otherwise modified.

28. Defendants' improper and illegal practices were applied uniformly to all members of the Class and arise out of the New Jersey statutory claims alleged herein so that the questions of law and fact are common to all members of the Class.

29. All members of the Class are similarly affected by Defendant Corporation breaching its employment contracts and retaliating against Plaintiffs for engaging in protected activities.

30. Based upon the massive number of Defendant Corporation employees that have been impacted by Defendant's unethical employment and business practices during the last 5 years, it is apparent that the number of impacted employees in the Class is so large as to make joinder impractical, if not impossible.

31. The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendant, and the relief sought within the Class is common to its members.

32. Plaintiffs will fairly and adequately represent, advance, and protect the interests of the members of the Class.

33. Plaintiffs have retained counsel that is competent and experienced in class action litigation.

34. Questions of law and fact common to the Class exist and predominate over questions affecting only individual members.

35. Certification of this class action is appropriate under Fed. R. Civ. P. Rules 23(a) and 23(b)(3) because the question of law or fact common to the respective members of the Class and any subclass predominate over questions of law or fact affecting only individual members.

36. This predominance makes class litigation superior to any other method available for a fair and efficient decree of the claims.

37. Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

38. Certification also is appropriate because Defendant acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole.

39. A class action is a fair and appropriate method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and burden on the courts that individual actions would engender.

40. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued about the management of this class action.

**NATURE OF ACTION:**

41. This is an action for monetary and declaratory relief to redress the Defendants' violation of the Plaintiffs' employment rights. Plaintiffs seek relief for Breach of contract; Fraud; Violations of the Conscientious Employee Protection Act; Sexual Harassment; Disability and Age Discrimination.

**FACTUAL BACKGROUND**

**Defendant siParadigm**

///

///

42. According to their Linkedin page Defendant siParadigm,

> "siParadigm has earned national accreditation from CLIA and CAP, as well as local licensing in several states. Our test menu achieves maximum coverage for potentially actionable aberrations such as: Single Nucleotide Variants (SNVs , Insertions & Deletions (InDels), Copy Number Variants (CNVs), Gene Fusions (RNA), Splice Variants (RNA), Somatic and germline Homologous Recombination Deficiency (HRD) and Loss of Heterogeneity (LOH) for Specific genomic signatures: Tumor Mutation Burden (TMB) and Microsatellite Instability (MSI). Our testing methodologies encompasses all major technologies for tissue-based and liquid biopsy testing of solid tumor and hematologic cancers as: IHC, Targeted or Broad-Panel DNA- and RNA-based, FISH, Cytogenetics, Flow Cytometry and Next Generation Sequencing (NGS). At siParadigm, our priority is accuracy, integrity, and quality for our clients. Our experienced team of professionals use advanced technology to provide prompt results to ensure accuracy. We also have a strong commitment to quality in order to guarantee the best results for you."

43. The defendant's LinkedIn Page failed to mention the fact that their leadership team, spearheaded by racist and ageist Defendant Aziz Saad, has committed approximately over one hundred acts of HIPAA violations and failed to inform or warn the victims whose information was compromised about the breach.

### THE UNITED STATES HEALTH AND HUMAN SERVICES ("HHS")

#### Breach Notification Rule

44. According to HHS's Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured protected health information. Similar breach notification provisions implemented and enforced by the Federal Trade Commission (FTC), apply to vendors of personal health records and their third-party service providers, pursuant to section 13407 of the HITECH Act.

#### Definition of Breach

45. According to HHS a breach is, generally, an impermissible use or disclosure under the Privacy Rule that compromises the security or privacy of the protected health information. An

impermissible use or disclosure of protected health information is presumed to be a breach unless the covered entity or business associate, as applicable, demonstrates that there is a low probability that the protected health information has been compromised based on a risk assessment of at least the following factors:

    a. The nature and extent of the protected health information involved, including the types of identifiers and the likelihood of re-identification;

    b. The unauthorized person who used the protected health information or to whom the disclosure was made;

    c. Whether the protected health information was actually acquired or viewed; and

    d. The extent to which the risk to the protected health information has been mitigated.

46. Covered entities and business associates, where applicable, have discretion to provide the required breach notifications following an impermissible use or disclosure without performing a risk assessment to determine the probability that the protected health information has been compromised.

47. There are three exceptions to the definition of "breach." The first exception applies to the unintentional acquisition, access, or use of protected health information by a workforce member or person acting under the authority of a covered entity or business associate, if such acquisition, access, or use was made in good faith and within the scope of authority. The second exception applies to the inadvertent disclosure of protected health information by a person authorized to access protected health information at a covered entity or business associate to another person authorized to access protected health information at the covered entity or business associate, or organized health care arrangement in which the covered entity participates. In both cases, the information cannot be further used or disclosed in a manner not permitted by the Privacy Rule. The final exception applies if the covered entity or business associate has a good faith belief that the unauthorized person to whom the impermissible disclosure was made, would not have been able to retain the information.

**Unsecured Protected Health Information and Guidance**

48. According to HHS covered entities and business associates must only provide the required notifications if the breach involved unsecured protected health information. Unsecured protected health information is protected health information that has not been rendered

unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the Secretary in guidance.

49. This guidance was first issued in April 2009 with a request for public comment. The guidance was reissued after consideration of public comment received and specifies encryption and destruction as the technologies and methodologies for rendering protected health information unusable, unreadable, or indecipherable to unauthorized individuals. Additionally, the guidance also applies to unsecured personal health record identifiable health information under the FTC regulations. Covered entities and business associates, as well as entities regulated by the FTC regulations, that secure information as specified by the guidance are relieved from providing notifications following the breach of such information.

50. View the Guidance Specifying the Technologies and Methodologies that Render Protected Health Information Unusable, Unreadable, or Indecipherable to Unauthorized Individuals.

## Breach Notification Requirements

51. According to HHS, following a breach of unsecured protected health information, covered entities must provide notification of the breach to affected individuals, the Secretary, and, in certain circumstances, to the media. In addition, business associates must notify covered entities if a breach occurs at or by the business associate.

## Individual Notice

52. According to HHS, covered entities must notify affected individuals following the discovery of a breach of unsecured protected health information. Covered entities must provide this individual notice in written form by first-class mail, or alternatively, by e-mail if the affected individual has agreed to receive such notices electronically. If the covered entity has insufficient or out-of-date contact information for 10 or more individuals, the covered entity must provide substitute individual notice by either posting the notice on the home page of its web site for at least 90 days or by providing the notice in major print or broadcast media where the affected individuals likely reside. The covered entity must include a toll-free phone number that remains active for at least 90 days where individuals can learn if their information was involved in the breach. If the covered entity has insufficient or out-of-date contact information

for fewer than 10 individuals, the covered entity may provide substitute notice by an alternative form of written notice, by telephone, or other means.

53. These individual notifications must be provided without unreasonable delay and in no case later than 60 days following the discovery of a breach and must include, to the extent possible, a brief description of the breach, a description of the types of information that were involved in the breach, the steps affected individuals should take to protect themselves from potential harm, a brief description of what the covered entity is doing to investigate the breach, mitigate the harm, and prevent further breaches, as well as contact information for the covered entity (or business associate, as applicable).

54. With respect to a breach at or by a business associate, while the covered entity is ultimately responsible for ensuring individuals are notified, the covered entity may delegate the responsibility of providing individual notices to the business associate. Covered entities and business associates should consider which entity is in the best position to provide notice to the individual, which may depend on various circumstances, such as the functions the business associate performs on behalf of the covered entity and which entity has the relationship with the individual.

## Media Notice

55. According to HHS, covered entities that experience a breach affecting more than 500 residents of a State or jurisdiction are, in addition to notifying the affected individuals, required to provide notice to prominent media outlets serving the State or jurisdiction. Covered entities will likely provide this notification in the form of a press release to appropriate media outlets serving the affected area. Like individual notice, this media notification must be provided without unreasonable delay and in no case later than 60 days following the discovery of a breach and must include the same information required for the individual notice.

## Notice to the Secretary

56. According to HHS, in addition to notifying affected individuals and the media (where appropriate), covered entities must notify the Secretary of breaches of unsecured protected health information. Covered entities will notify the Secretary by visiting the HHS web site and filling out and electronically submitting a breach report form. If a breach affects 500

or more individuals, covered entities must notify the Secretary without unreasonable delay and in no case later than 60 days following a breach. If, however, a breach affects fewer than 500 individuals, the covered entity may notify the Secretary of such breaches on an annual basis. Reports of breaches affecting fewer than 500 individuals are due to the Secretary no later than 60 days after the end of the calendar year in which the breaches are discovered.

### Notification by a Business Associate

57. According to HHS, if a breach of unsecured protected health information occurs at or by a business associate, the business associate must notify the covered entity following the discovery of the breach. A business associate must provide notice to the covered entity without unreasonable delay and no later than 60 days from the discovery of the breach. To the extent possible, the business associate should provide the covered entity with the identification of each individual affected by the breach as well as any other available information required to be provided by the covered entity in its notification to affected individuals.

### DEFENDANT CORPORATION ENGAGES IN EGREGIOUS HIPAA VIOLATIONS AND FAILS TO NOTIFY THE IMPACTED INDIVIDUALS IN VIOLATION OF RULE, 45 CFR §§ 164.400-414

58. From its inception, Defendant Corporation has committed egregious acts of HIPAA violations.

59. On or about April 6, 2023, Defendants exposed the Private Health Information of Thomas X[1]. Mr. X's diagnosis, social, home address, and date of birth were all disclosed.

---

[1] X is not this individual's last name.



60. Upon information and belief, Defendants did not inform Mr. X and or his treating physician about this HIPAA violation.

61. On or about April 4, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient Shanna X[2] were disclosed.



---

[2] X is not this individual's last name.

62. Upon information and belief, Defendants did not inform Ms. X and or her treating physician about this HIPAA violation.

63. On or about April 7, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient Roseann X[3] were disclosed.



---

[3] X is not this individual's last name.

64. Upon information and belief, Defendants did not inform Ms. X and or her treating physician about this HIPAA violation.

65. On or about April 29, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient Alexander X[4] were disclosed.



---

[4] X is not this individual's last name.

66. Upon information and belief, Defendants did not inform Mr. X and or his treating physician about this HIPAA violation.

67. On or about May 5, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient Larry X[5] were disclosed.



---

[5] X is not this individual's last name.

68. Upon information and belief, Defendants did not inform Mr. X and or his treating physician about this HIPAA violation.

69. On or about May 5, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient Eva X[6] were disclosed.



---

[6] X is not this individual's last name.

70. Upon information and belief, Defendants did not inform Ms. X and or her treating physician about this HIPAA violation.

71. On or about May 5, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient David X[7] were disclosed.



---

72. Upon information and belief, Defendants did not inform Mr. X and or his treating physician about this HIPAA violation.

73. On or about May 5, 2023, Defendants committed another HIPAA violation when the Private Health Information and date of birth of Patient David X[8] were disclosed.



74. Upon information and belief, Defendants did not inform Mr. X and or his treating physician about this HIPAA violation.

---

[8] X is not this individual's last name.

75. On or about December 2022 one of Defendants former employees blew the whistle and sent an email to many of defendant's clients informing them and warning them that their patients private health information was exposed to individuals in Egypt.

> WARNING: This email originated outside CSNF. Please exercise caution when opening attachments or links.
>
> Hi Dr.Susmitha,
>
> siparadig diagnostic lab is located in NJ and generates lab reports about hematologic cancers for the American patients. It unofficially outsources all the flowcytometry gating/reporting, the molecular test interpretation, the medical interpretation and the triage to be performed by personnel from outside the USA in the Middle East and the Egypt. There is a liability of HIPAA breach because the U.S. patients' national IDs attached on the requisitions plus their final full medical details and the healthcare provider details are stored locally with the workers there. The siparadigm in the Egypt appears on google to be a pharmacy not a diagnostic lab, so, I think the work there seems to be fragile with no governmental regulations or responsibilities. The lab does this in order to maximize the profits, that's why it sometimes offers 20% commission for referral in the USA. I have received many of requisitions and medical reports carrying your name and details but I discarded completely, I noted that the majority were with negative flowcytometry results, this may reflect over ordering of such tests. I also noted medical and non-medical insurance companies were cced in that email. Please take care.
>
> Regards,
>
> David, MD

DEFENDANT CORPORATION HAS FAILED TO COMPLY WITH HIPAA
SINCE APRIL 12, 2021

76. On or about April 12, 2021, at 7:30 pm, Montville Township Board of Health held its Regular Meeting.

77. During that meeting, Defendant Corporations' sloppy unprofessionalism and inability to follow HIPAA guidelines were a topic of discussion.

78. See **Attachment A**, the Montville Township Board of Health Regular Meeting Minutes.

DEFENDANT SAAD ACKNOWLEDGES THAT THE COMPANY HAS COMMITTED HIPAA VIOLATIONS

79. In a July 2023 email, Defendant Saad acknowledged that Defendant Corporation had committed HIPAA violations.

80. In spite of this acknowledgment, Defendant Saad still failed to alert the victims of this HIPAA violation that their Private Health Information was breached.

9:55    5G

# Critical Update: Secure Handling and Disposal of Client Login Credentials  Inbox

**Aziz Saad**  9:51 AM
to Sales, Patricia, Sales, Mohamed

Dear Team,

I hope this email finds you well. I am writing to address a matter of paramount importance that pertains to HIPAA.

It has been brought to our attention that there may have been instances where client login credentials have been retained beyond the point of issuing these to the clients. This is a severe violation of both our company policy and federal law, specifically HIPAA, which mandates strict confidentiality and security measures to protect sensitive patient health information.

Effective immediately, all members of the Sales Team are strictly prohibited from retaining any client login credentials once these have been passed onto the client. Under no circumstances are team members to use these credentials to access a client's portal. This is non-negotiable and we expect full compliance from everyone.

Please remember that the mismanagement of sensitive information can have serious consequences, ranging from penalties and legal action against our company to compromising the trust relationship we've built with our clients. Your full cooperation and diligence in this matter are vital to ensure our continued success and to maintain the high standards we have set for ourselves as a company.



9:55    5G

Please remember that the mismanagement of sensitive information can have serious consequences, ranging from penalties and legal action against our company to compromising the trust relationship we've built with our clients. Your full cooperation and diligence in this matter are vital to ensure our continued success and to maintain the high standards we have set for ourselves as a company.

Please make it a priority to review and adhere to our data privacy policies, especially those regarding client login credentials. We trust in your understanding that these rules are in place to ensure that we provide the best service to our clients while upholding the integrity and reputation of our company.

For full transparency and to ensure understanding of this directive, we ask that you reply to this email acknowledging receipt and understanding of this critical policy update.

Should you have any questions or require further clarification, please feel free to reach out.

Thank you for your prompt attention to this matter.

Best Regards,



**Aziz F. Saad, MD**
Chief Commercial Officer

siParadigm
diagnostic informatics

Phone  +1 888-599-5227 ext.4063    25 Riverside Dr, Ste 2
Mobile  +1 347-898-6703    Pine Brook, NJ 07058
Fax  +1 201-599-9066    United States
Email  aziz.saad@siparadigm.com    www.siparadigm.com

**Paul Christian Burk**

81. Mr. Burk has extensive experience working as a Sales Representative.

82. Upon information and belief, Mr. Burk was wrongfully terminated because he questioned Defendant's plans to cut salaries and change the commission schedule, disregarding the contract he signed with the Defendants.

83. Mr. Burk was also terminated for raising concerns regarding the plaintiff's egregious HIPAA Violations.

84. The week before his termination, Mr. Burk was informed that he had been doing a "great job."

85. The only thing that changed was that Mr. Burk engaged in a protected activity.

86. In addition to engaging in protected activities detailed above, Mr. Burk was informed by his manager, BJ Osso, that he was terminated due to his age. Mr. Burk is over the age of 40.

87. In addition to violating Mr. Burk's protected rights, Defendant failed to fully compensate him as they are contractually obligated to do.

88. Mr. Burk is also a victim of the Defendants' decision to pay him significantly less than his female colleagues in violation of the NJLAD and the Federal Equal Pay Act.

**Laina Dutton**

89. Ms. Dutton is a fifty-one-year-old female with extensive experience as a molecular oncology specialist.

90. Ms. Dutton was wrongfully placed on a performance improvement plan on or about 06/13/2022 due to her engaging in a protected activity.

91. Ms. Dutton called the Defendants out on their fraudulent practices, and she raised concerns over the Defendants' misrepresentations of her job requirements, the Defendants' failure to define expectations when asked, and the Defendant's apparent breach of contract by reducing Ms. Dutton's compensation.

92. Ms. Dutton also raised concerns regarding the Plaintiff's violation of patients' HIPAA rights, as it was abundantly clear to Ms. Dutton, who possessed over a decade of experience working in this industry, that Defendants did not have the proper safeguards in place to protect patient information both internally (as evidenced by the reckless emails sent above), and externally, as evidenced by the whistleblower who reported the HIPAA breach to many of defendants clients.

93. Upon information and belief, Ms. Dutton was terminated because she questioned why she was compensated significantly less than her male colleagues.

## **Lawrence LaMaina**

94. Mr. LaMaina is a forty-six-year-old male with extensive experience as a Territory Sales Manager.

95. Mr. LaMaina has over twenty years of sales experience.

96. He was wrongfully terminated on or about 05/24/2022 due to his engagement in a protected activity when he raised concerns about race and age discrimination.

97. Shortly after, Mr. LaMaina complained his position was posted.

98. Within days of posting his position, Defendants terminated Mr. LaMaina.

99. Upon information and belief, Mr. LaMaina was replaced by someone several years his junior who did not possess a scintilla of his 22 years of sales experience.

100. Mr. LaMaina was also terminated for raising concerns regarding the plaintiff's egregious HIPAA Violations.

101. In addition to violating Mr. LaMaina's protected rights, Defendant failed to fully compensate him as they were contractually obligated to do.

## **Samantha Libby**

102. Ms. Libby is a 45-year-old Caucasian female with extensive experience as a BDE Sales Specialist.

103. Ms. Libby was wrongfully placed on a performance improvement plan on or about 10/20/2022 as retaliation due to her engaging in a protected activity.

104. Ms. Libby was a whistleblower who requested NJLAD, ADA, and FMLA-protected medical leave.

105. She needed a medical procedure and was punished after she provided a medical request for leave.

106. In addition to violating Ms. Libby's ADA and FMLA-protected rights, Defendant harassed her, fraudulently misrepresented her role before hire, and failed to fully compensate her as they are contractually obligated to do.

107. Upon return from protected medical leave, Ms. Libby's business accounts were removed from her book and given to her temp replacement, who had no prior work experience and is 23

years her minor. She was again put on an unachievable performance improvement plan and wrongfully terminated in an act of retaliation for her role as a whistleblower.

### Virginia Lee

108.    Ms. Lee has extensive experience working as an Oncology Sales Specialist.

109.    Ms. Lee was wrongfully terminated due to Ms. Lee's request to take medical leave.

110.    In addition to violating Ms. Lee's NJLAD, ADA, and FMLA-protected rights.

111.    Upon information and belief, Ms. Lee was retaliated against for raising concerns regarding the plaintiff's egregious HIPAA Violations

112.    Defendant harassed Ms. Lee, fraudulently misrepresented Ms. Lee's role before hire, and failed to fully compensate Ms. Lee as they are contractually obligated to do.

113.    Ms. Lee was out on physician-mandated medical leave months after filing ADA paperwork with the Company.  After reinstatement, harassment about Ms. Lee's size of salary pay became a weekly topic.  Ms. Lee had her role reduced and was subsequently terminated.

114.    Ms. Lee was the only person released from sales (second termination) in the "RIF" after refusing a decrease in pay.

### Tim Mariakakis

115.    Mr. Mariakakis is a Caucasian male with extensive experience as a Sales Executive.

116.    Mr. Mariakakis was wrongfully terminated after filing internal complaints concerning the disturbing patterns and practices of the Defendant.  This include but is not limited to recklessly handling patient information, stealing his commissions, and stealing his territory and contains only to have them turned over to younger inexperienced salespeople who are under the age of 40.

117.    Upon information and belief, Mr. Mariakakis was retaliated against for raising concerns regarding the plaintiff's egregious HIPAA Violations.

118.    In addition to his internal complaints, Defendant reneged on their contractual obligation to pay Mr. Mariakakis his bonus and his regular pay.

### Michael McDonough

119.    Mr. McDonough is a forty-two-year-old male with extensive experience as a Business Development Manager.

120.    Mr. McDonough was wrongfully terminated due to his age and was replaced by someone significantly young and less experienced.

121.    Upon information and belief, Mr. McDonough was retaliated against for raising concerns regarding the plaintiff's egregious HIPAA Violations.  This include but is not limited to recklessly handling patient information, stealing his commissions, and stealing his territory and contains only to have them turned over to younger inexperienced salespeople who are under the age of 40.

122.    In addition to this blatant act of age discrimination, Defendant reneged on their contractual obligation to pay Mr. McDonough his quarterly bonus.

**<u>Lindsey Forbus</u>**

123.    Ms. Forbus is a female with extensive industry experience.

124.    Ms. Forbus requested ADA and FMLA-protected medical leave to recover from a medical condition.

125.    She was harassed and targeted and retaliated against for taking medical leave.

126.    In addition to violating Ms. Forbus's ADA and FMLA-protected rights, Defendant harassed her, misrepresented her role, and failed to fully compensate her as they are contractually obligated to do.

127.    Upon information and belief, Ms. Forbus was terminated for raising concerns regarding the plaintiff's egregious HIPAA Violations.

128.    In addition to previously mentioned claims, Ms. Forbus was a victim of sexual harassment by her manager, Chris Weidman.  An example of Mr. Weidman's consistent acts of sexual harassment of Ms. Forbus is as follows:



**11:19**

← **Chris Weidman**
● Mobile · 2h ago          •••  ▣

every day and now all the execs have to

When I come down to tampa next time you
should buy me dinner

**Lindsey Forbus** · 5:31 pm
Deal. Haha I'll be in Birmingham again June 7-12 ✓

**Chris Weidman** (Just Me) · 5:33 pm
I'm going to California for work those days.
Seeing your little gf up here?

**Lindsey Forbus** · 5:34 pm
Nah I cover Alabama and go every other month ✓

This is a division meeting so I'll be at the
GrandBo ✓

**Chris Weidman** (Just Me) · 5:35 pm
Nice!  Let me know when you come up for work.
Maybe I can slip away and see what kind of
trouble We can get into

**Lindsey Forbus** · 5:36 pm
Oh lord. I can always find trouble in Bham lol ✓

**Chris Weidman** (Just Me) · 5:37 pm
Sounds like a plan.  Just wear something cute lol

**Lindsey Forbus** · 5:38 pm
Shouldn't be difficult. I'm 20 lbs lighter than
when you last saw me. ✓

**Chris Weidman** (Just Me) · 5:39 pm
🤔

**Chris Weidman** (Just Me) · 5:50 pm
I bet you look good

⌗ Write a message...          🎤

### Edward Dix

129.    Mr. Dix has extensive experience working as an Oncology Sales Specialist.

130.    Mr. Dix questioned the Defendant's failure to pay Mr. Dix his earned salary.

131.    Upon information and belief, Mr. Dix raised concerns regarding the plaintiff's egregious HIPAA Violations.

132.    Mr. Dix also raised concern over the Defendant's decision to renege on their contractual obligation to pay him his $80k commission and an additional $1,500 per month.

133.    After raising these concerns, Defendant retaliated against Mr. Dix which resulted in his involuntary departure from defendant's company.

134.    In addition to their blatant acts of retaliation, the Defendants engaged in acts of wage discrimination.  Mr. Dix was paid significantly less than his comparable female colleagues.

### Peter Franzone

135.    Mr. Franzone has over thirty-five years of experience working as Business Development and Molecular Oncology Management representative.

136.    Mr. Franzone was wrongfully terminated on or about 6/2/2022.

137.    As was the pattern and practice of the Defendants, Mr. Franzone was replaced by individuals twenty years his junior with less experience who was compensated at least $20,000 a year more than him.

138.    Upon information and belief, Mr. Franzone was retaliated against for raising concerns regarding the plaintiff's egregious HIPAA Violations.

139.    In addition to violating Mr. Franzone's protected rights, Defendant failed to fully compensate him as they were contractually obligated to do.

### John Berry

140.    Mr. Berry has over 14 years of extensive experience working as a Precision Oncology Specialist.

141.    Mr. Berry was a victim of the Defendant's pattern and practice of wage discrimination.

142.    Upon information and belief, Mr. Berry was retaliated against for raising concerns over the HIPAA violations Defendant organization committed and failed to report to the impacted individuals.

143.     In addition to their blatant acts of discrimination, Defendant failed to fully compensate Mr. Berry as they were contractually obligated to do. Mr. Berry was also wrongfully terminated.

144.     As is the pattern and practice of the Defendants, Mr. Barry was terminated and replaced by someone under the age of 40 who all had less experience than him.

### Ryan Miller

145.     Mr. Miller has over fifteen years of experience as a Business Development sales executive.

146.     Mr. Miller was terminated without cause.

147.     Defendants failed to fully compensate Mr. Miller as they are contractually obligated to do.

148.     Upon information and belief, Mr. Miller was retaliated against for raising concerns over the HIPAA violations Defendant organization committed and failed to report to the impacted individuals.

149.     As is the pattern and practice of the Defendants, Mr. Miller was terminated and replaced by someone under the age of 40 who all had less experience than him.

### Hank Swank

150.     Mr. Swank has extensive experience working as a Business Development Executive.

151.     At one point, Mr. Swank was the representative of the month and exhibited an outstanding performance within the Defendants' organization.

152.     After reporting rampant HIPAA violations and being wrongfully accused of spreading rumors by Defendant Saad, Mr. Swank was placed on a performance improvement plan.

153.     According to Mr. Swank's manager, the performance improvement plan was a pretext used by Defendant Saad to terminate Mr. Swank.

154.     Upon information and belief, Mr. Swank was retaliated against for raising concerns over the HIPAA violations Defendant organization committed and failed to report to the impacted individuals.

155.     In addition to violating Mr. Swank's protected rights, Defendant's failed to fully compensate him as they are contractually obligated to do.

### John Ferrazza

156.     Mr. Ferrazza was employed by the defendants from April 14, 2021, to March 2022.

157.     He was employed as the Director of Sales and Strategic Accounts.

158.    Defendants had no grounds for termination, they kept Mr. Ferrazza entire team while getting rid of 80% of the rest of the sales force.

159.    They hired Chris Weidman, to replace Mr. Ferrazza before he was ever let go.

160.    They terminated Mr. Ferrazza in December to get out of paying him his contracted Q4 bonus.  Mr. Ferrazza was due $33,000.00 plus salary and benefits.

161.    Upon information and belief, Mr. Ferrazza was retaliated against for raising concerns over the HIPAA violations Defendant organization committed and failed to report to the impacted individuals.  In addition to the HIPAA violations, Mr. Ferrazza protested the discriminatory termination and hiring practices that individual defendants Aziz and Khan forced him to implement.

162.    Mr. Ferrazza lost over 6 months' salary and 3 earned bonuses.

## Charles Taylor

163.    Mr. Taylor is a fifty-seven-year-old male with extensive experience as an Oncology Sales Specialist.

164.    Mr. Taylor has over twenty years of sales experience and was constructively discharged on or about 09/13/2022.

165.    Mr. Taylor requested medical leave for a day and was denied by Defendant Saad.

166.    Mr. Taylor was also required to secure new accounts, and then Defendants would confiscate those accounts and turn them over to younger representatives.

167.    Upon information and belief, Mr. Taylor was retaliated against for raising concerns over the HIPAA violations Defendant organization committed and failed to report to the impacted individuals.

168.    Mr. Taylor was also chastised for requesting medical leave and believes that his medical leave request led to his termination.  Additionally, Mr. Taylor was terminated and replaced y an individual who is less than 40 years old.

169.    In addition to violating Mr. Taylor's protected disability rights, Defendant failed to fully compensate him as they were contractually obligated to do.

## AJ Holderman

170.    Mr. Holderman is a Caucasian man.

171.    Mr. Holderman was employed at Defendant Corporation as a Hereditary Cancer Specialist, Oncology and has over ten years of experience in this position.

172.    Mr. Holderman was more than qualified for his position with Defendant corporation.

173.    Mr. Holderman was an account manager for defendant corporation.

174.    Mr. Holderman was harmed by Defendants' when they breached his contract, reduced his base salary without consideration, and reneged and withheld his earned commissions.

175.    Mr. Holderman did not have any disciplinary issues with defendant organization, so much so, that he was promoted to Oncology account manager.

176.    Mr. Holderman is disabled, as that term is defined under the ADA and the NJLAD. He suffered from paralysis of his left arm and hand.  On or about December 2022, Mr. Holderman informed the defendants that he was disabled and required reasonable accommodations.  Mr. Holdeman's accommodations request was denied.

177.    In addition to violating Mr. Holderman's protected disability rights, Defendants failed to fully compensate him as they were contractually obligated to do.

178.    Mr. Holderman was terminated in an act of retaliation for reporting HIPAA violations and asking for disability accommodations.  Mr. Holderman was terminated and replaced by someone under the age of 40.

### Eric Hildebrandt

179.    Mr. Hildebrandt is a Caucasian male with extensive experience working as a sales specialist.

180.    Mr. Hildebrandt is grossly underpaid, earning a 1% bonus on the top revenue accounts he brings in.

181.    This bonus structure is a clear breach of contract and represents an act of retaliation by Mr. Hildebrandt's managers due to Mr. Hildebrandt raising concerns about disparate treatment and pay discrimination.

182.    Upon information and belief, Mr. Hildebrandt was retaliated against for raising concerns over the HIPAA violations Defendant organization committed and failed to report to the impacted individuals.  In his over ten years in the industry Mr. Hildebrandt was taken aback by the sloppy and negligent way in which Defendants maintained their patient's private sensitive information internally and externally.  For example, there was no secure server, and

34

defendants would send patient lab results, social security numbers, and date of births via email externally and internally to unsecured services in Egypt.

183.    In fact, Mr. Hildebrandt's managers have a pattern and practice of disparaging and defaming Mr. Hildebrandt's character and questioning his intelligence with his colleagues.

184.    In addition to violating Mr. Hildebrandt's protected rights, Defendants failed to fully compensate him as they are contractually obligated to do.

**Former siParadigm Manager Exposes, Defendants Discriminatory Objectives**

185.    Former senior manager, BJ Osso informed plaintiffs that the individual defendants hired plaintiffs, obtained access to their territories and network, and the terminated plaintiffs and replaced them with workers who were younger than 40 years old, and female. According to Defendant Aziz, young, slim, attractive workers are better at sales, and generates more business.

186.    Mr. Osso was brought on board at Defendant siParadigm in March of 2022.

187.    Mr. Osso had been recruited from another employer to "build and expand" Defendant Corporation's organization.

188.    Mr. Osso's role did not require independence or discretion.  Unfortunately, everything Mr. Osso did was crosschecked and be micromanaged by the individual defendants.

189.    Mr. Osso was a sales leader and one of two Regional Directors.

190.    During the onboarding process, Mr. Osso discovered that there was no leadership.

191.    Mr. Osso had to develop an entire onboarding process for himself, and then for the team Mr. Osso would hire.

192.    Mr. Osso used recruiters with professional integrity to help find the proper talent.

193.    Mr. Osso worked with Ed Dooling, John Seager, and Megan Manzano.  Ed and John found talent.  Mr. Osso is not sure if they were paid or not for their services via contracts that were signed.

194.    However, Mr. Osso's income was docked for using recruiters.  This unorthodox practice was something Mr. Osso was unaware of.

195.    Mr. Osso is aware of Defendants engaging in bait-and-switch recruiting tactics.  For example, if they were in negotiations with someone at that time and offers were verbally or even written, Mr. Osso was told to change the offers.

196.    Another example of Defendants' unethical practices is the Defendant's acts of moving goalposts on a regular basis so their employees never know what to expect.

> For instance, Defendants often hired employees with a 3 over 3 specimen acquisition. This means that employees would receive a commission after securing 3 specimens and would have to secure 3 additional specimens each month more than the previous month to secure their commission payments.  Midmonth Defendants would change the specimen acquisition requirements without providing any consideration to the employees for this clear breach of contract.  Defendants knew that they had a requirement to compensate their employees for this change in contract.  This is evidenced by the fact that they increased some of their employees' base pay by 15-30 thousand dollars.  One of these employees is Eric Hildebrandt.

### In An Additional Violation Of Public Policy, Defendants Forced Plaintiff To Terminate Qualified Candidates Due To Their Gender And Age

197.    Mr. Osso hired multiple candidates who were qualified and proper fits for the job description.

198.    However, Mr. Osso was forced to fire them or constructively discharge them because the rules and the goalpost were changed on them.

199.    Ultimately, when someone left, Mr. Osso was blamed, even though he was following the directive of the individual defendants.

200.    Mr. Osso hired Chris Burk, who later was pushed out by Aziz and Chris Weidman.  Mr. Burk was targeted from the beginning by these two due to Mr. Burk's gender and age.  Mr. Osso was directed to stop hiring people that are old men.  Mr. Osso was strongly encouraged to hire younger females.  Ultimately, Mr. Osso was made to fire Mr. Burk and not allowed to give any details as to the reason.

201.    Mr. Osso hired Ray Ma, who quit because the goalposts were moved multiple times.  Mr. Ma had his contract breached and was required to provide to meet certain deliverables in order to secure his commission payments.  These payments never came, as Defendants changed the commission structure mid-month and did not provide Mr. Ma with consideration for this breach of contract.

202.    Mr. Osso hired Dan Verostko, an extremely talented and successful rep, who left because the goalposts were moved on him.

203.    Mr. Osso hired Dave Rickard, who left because the guaranteed dollars were changed on him for what he would be paid each month.

204.    Mr. Osso hired Patrick Verdun, who was a pharmacist and an older gentleman. He had tremendous knowledge and great insight into technology.

205.    Mr. Osso inherited Sandy Wong, who specifically asked to be on Mr. Osso's team when her previous manager of 3-months made inappropriate comments to her. Aziz had it out for her and kept telling Mr. Osso he needed to fire her. Mr. Osso had no reason again; Aziz forced this issue on August 12th when he called Mr. Osso and said you must do this as I don't like her attitude. Mr. Osso had no problem with Sandy, and she was working toward closing the business they had been discussing. She was not in violation of any company policies.

206.    Mr. Osso inherited Tom Daratony, who had been working there before Mr. Osso arrived. He quit after Aziz moved the goalpost on him.

207.    Mr. Osso also inherited Whitney VanCleave – the longest-tenured employee. She was very nice and professional. She had some business but was not growing it. Aziz gave her perfect marks and a $5000 bonus each month. She left shortly after Mr. Osso for another lab.

208.    Mr. Osso did not know, nor did he enquire about the exact ages of the person he was recruiting to work on his team. In fact, Mr. Osso's focus when recruiting was to hire individuals based on their skills, experience, and relationships within the industry.

209.    The team Mr. Osso was building was one that the talent had been validated and then sent to Mr. Osso for final approval. This is important because, at a virtual meeting on August 29th at 11:00 am EST, Mr. Osso was on a call with Aziz, Chris, and Kris (the leadership team), and Mr. Osso was informed that because he hired a few older white men and they "didn't get the job done" we should only look to hire young girls.

210.    Now, if you look at the posts on Chris Weidman's LinkedIn page, his team is all young girls. As of March 2022, Chris himself said that Mr. Osso was the only male he ever hired.



Some Members of Chris's Team

211.    The folks Mr. Osso hired were hired because they had a skill set that matched what the job entailed, not a specific age.  They had a successful track record, and they had a passion for wanting to help people.

212.    Defendants' fraudulent bait and switch tactics are further evidenced by the fact Defendants required Plaintiff to recruit salespeople for an entry-level sales position because they wanted to bleed these experienced employees of their network and relationships and then later renege on their commissions and base pay.

213.    Defendants wanted high-priced talent and then expected Mr. Osso to undercut them with lowball offers, renege and or withhold commissions, and a sudden reduction in base pay.  In some cases, even ask them to show us they can sell before we pay them their salary.

214.    Aziz called it a "tiered model."

> A rep worthy of 150K would be offered 80K base a year and then told if they sell a certain amount, they will get moved to 100K, all the way up to the base of 150K. Then, once the business has been brought in, Aziz would undercut their bonus or change how he would pay it.  This is not an industry model or accepted practice. Yes, 80K is an extremely respectable salary, but folks at this level are looking for and were told 150K.  This caused most folks to leave, and then we were held accountable for not getting them to join.  The stress and emotional turmoil were nothing short of an abusive environment.

**Breakdown Of Plaintiff's Hires And The Outcome Of Their Employment With Defendants**

215.    Aziz Saad and Chris Weidman were Mr. Osso's supervisors.

216.    Aziz functioned as the President of the sales force, and Chris was the VP/Regional manager.

217.    Chris was doing dual roles as he was asked to continue leading the SE team, too.  This is just another example of what siParadigm does in getting employees to do multiple roles but only pay them for one.

218.    Mr. Osso hired multiple candidates who were qualified and a proper fit per the job description.

219.    Ultimately, Aziz squeezed people by breaching their contracts, changing their commission structures without paying them consideration, and or stripping them of their territories after securing relationships and information about their network of hospitals and doctors.

220.    When he didn't like someone after a few weeks of being at the company, Aziz would begin his calls to Mr. Osso and let Mr. Osso know the person needed to go.

221.    Mr. Osso pushed back on all his calls, citing the fact that he needed to train them and work with them.  Mr. Osso was forced to be the trainer and come to NJ and train the team and others hired from around the country.  In the end, Mr. Osso was never paid his commission of $125,000 after he filled out his team.

222.    Defendants instructed Plaintiff to recruit and hire top-notch folks.  Plaintiff was given some autonomy to provide sign-on bonuses or guarantees to help with the transition from the employees' prior role to siParadigm.

223.    This gave folks a 3–6-month period to get ramped up as they built their business.

224.    This is common practice in the industry.  However, the goalposts were moved multiple times by Aziz when he decided to stop paying on guarantees and changed how reps were assessed each month to attain their commissions once they were hired.

225.    Aziz admitted the goal of the Defendants corporation was to hire folks with a book of business that they could bring with them and then, once hired, convert that business, fire the employees, and hire younger workers to take over the business.

226.    Mr. Osso never engaged in the practice and hired those who were qualified to build and grow the business in the industry with the tenure and knowledge needed to do so.

227.    Aziz was asking Mr. Osso to perform an illegal practice in the medical/lab industry; health systems, hospitals, and doctors aren't for sale!!!

228.    In the lab space, salespeople provide a service and see if those services can help assist clients in meeting their goals in helping to advance patient care, PERIOD!  To ask to buy a "book of business" sets the wrong tone and destroys the spirit of the testing that is life changing.

229.    Mr. Osso believes it is not only unethical in practice but also illegal to suggest this to potential employees of the organization.

230.    As Mr. Osso started to work with his team, Aziz pushed to get the results he wanted his way, and it was clear Mr. Osso's job was in jeopardy if he did not follow Aziz's orders.

231.    Aziz made changes to push qualified folks out; please see specific examples below:

**Chris Burk**

232.    Mr. Osso hired Chris Burk as a tenured rep coming from another lab where he had strong NGS experience.  This was a strong suit for Mr. Osso, as Mr. Burk was trained.

233.    Mr. Osso felt with his successful record and clear understanding of the field and the territory, Chris would be a great addition to his team.

234.    Mr. Osso was told by Aziz, shortly after he hired Mr. Burk he needed to go.  It is Mr. Osso understanding that Mr. Burk was targeted from the beginning by Aziz due to his age and gender.

235.    Mr. Osso was reminded by Aziz, that he did not want to hire old white men because they were "too slow".

236.    Mr. Osso never understood why Aziz had his discriminatory policy.  Mr. Burk clearly fit the job description and was a good hire.

237.    When Mr. Osso was forced to let Mr. Burk go, human resources would not allow Mr. Osso to give any details as to why.  Mr. Osso was told to follow a script, and that was it.

238.    Human resources said not to provide details as we would be doing more of these in the future.

239.    Mr. Osso complained to human resources, informing them that he did not feel comfortable terminating qualified employees for no reason, especially not for the reasons Aziz provided to justify terminating Mr. Burk.

**Ray Ma**

240.    Mr. Osso hired Ray Ma ("Mr. Ma") as he was a tenured and successful sales representative.

241.    His experience in oncology was strong, and he was extremely motivated and excited.

242.    Aziz changed Mr. Ma's commission structure and how his sales were to be assessed not even one month into both Mr. Burk's and Mr. Ma's tenure with the company.

243.    Mr. Ma felt lied to when his goals were changed, and how we would be paid because of those changes frustrated him.

244.    Aziz knew it would and said we need the right people. He never gave Mr. Ma or any of the others a chance and made Mr. Osso look like a liar when he changed the details of how his hires would get paid moving forward.

245.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring. He also complained to HR about what he viewed as the unethical breaches of contracts which made him look terrible to his employees and members in this industry.

**Dan Verostko**

246.    Mr. Osso hired Dan Verostko ("Mr. Verostko"), an extremely talented, tenured, and successful rep, who was squeezed out of the company by Aziz.

247.    Mr. Verostko left after Mr. Osso because the goalposts were moved on him by Aziz.

248.    Mr. Osso did not know, but Chris Weidman had initially started a dialogue with Mr. Verostko to try and buy his book of business.

249.    Mr. Osso interviewed and offered Mr. Verostko the job based on his experience and what Mr. Osso believed he could do.

250.    Mr. Osso later found out they wanted to buy his book of business, and when Mr. Verostko did not want to try and move previous clients in that way, they pressed him.

251.    Mr. Verostko was looking for new business, but that wasn't what Aziz wanted to hear, so, he forced him out.

252.    Aziz only wanted Mr. Verostko large book of business, other than his large book of business Mr. Verostko was considered too old and slow.

253.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring. He also complained to HR about

what he viewed as the unethical breaches of contracts which made him look terrible to his employees and members in this industry.

**Dave Rickard**

254.    Mr. Osso hired Dave Rickard ("Mr. Rickard") as he came from the hereditary space, a third product line siParadigm offers.

255.    His experience and success were a great match for understanding the territory and the oncology field.

256.    Unfortunately, he felt lied to and distrusted the leadership team because Aziz decided to change his guarantee right out of the gates.

257.    Aziz pressed me to get rid of him because they wanted to get rid of the guarantee.

258.    He resigned and left because Aziz breached his contract by changing his goals, removing his guarantee, and changing his commission without compensation.

259.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring.  He also complained to HR about what he viewed as the unethical breaches of contracts which made him look terrible to his employees and members in this industry.

**Patrick Verdun**

260.    Mr. Osso hired Patrick Verdun ("Mr. Verdun"), who was a pharmacist and an older gentleman.  He had tremendous knowledge and great insight into the technology.  He was excited and motivated for this opportunity.

261.    Mr. Osso was forced to terminate Mr. Verdun due to his age.

262.    This situation has been one of the hardest decisions I was forced to make, and it left me very depressed.

263.    Mr. Osso protested having to terminate Mr. Verdun, stating that it was nothing short of age discrimination.

264.    In spite of Mr. Osso's protest, Aziz and Chris pressed on and actually used Mr. Verdun's age and termination as an example, by both Aziz and Chris, as "what not" and "who not" to hire on a Zoom call.

265.    On that call, Aziz instructed the managers to only hire "young females."

266.    As previously stated, if you look at Chris' team on LinkedIn, you will see that all he hires are young females.

267.    Mr. Verdun was working his territory when Mr. Osso was on vacation, and Aziz called Mr. Osso multiple times.

268.    He informed Mr. Osso that the company was changing Mr. Verdun's guarantee and that the company would not be getting that pay.

269.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring.  He also complained to HR about what he viewed as unethical breaches of contracts which made him look terrible to his employees and members in this industry.

**Sandy Wong**

270.    Mr. Osso inherited Sandy Wong ("Ms. Wong"), who had only been with the organization for about 3 months, when her previous manager, Sri Krishnamurti, made inappropriate comments to her, and she quit.

271.    At that time, Aziz called her, and she said she would come back if she could be on Mr. Osso's team.

272.    Mr. Osso had trained Sandy, and she knew Mr. Osso was a professional and believed Mr. Osso could help her be successful.

273.    Aziz made the switch it changed everything; Mr. Osso was covering the Midwest but was now told to work in the NE with Ms. Wong.

274.    Aziz had it out for her after she complained about her previous manager, who made the inappropriate comments.

275.    Aziz called Mr. Osso weekly, saying she needed to go and Mr. Osso had to do it.

276.    Aziz would try to set impossible goals, setting her up to fail.

277.    Mr. Osso fought back against him, but he forced this issue on August 12th when he called Mr. Osso and said, "You must do this ("terminate Ms. Wong) today".  Mr. Osso had no problem with Ms. Wong, as she was efficient and working at a high standard.

278.    She was not in violation of any company policies and was forced out by Aziz because he did not like that she spoke up about inappropriate behavior by her manager.

279.    Ms. Wong was retaliated against by Aziz for engaging in a protected activity when she reported the inappropriate comments visited upon her by her manager Sri Krishnamurti.

280.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring.  He also complained to HR about what he viewed as the unethical breaches of contracts which made him look terrible to his employees and members of this industry.

**Tom Daratony**

281.    Mr. Osso inherited Tom Daratony ("Mr. Daratony"), who had been working at siParadigm before Mr. Osso got there.

282.    Mr. Daratony was a hard worker.

283.    Mr. Daratony was never supported or trained.

284.    He was hired and thrown to the wolves with no support.

285.    Mr. Daratony and Mr. Osso were working on his strategy when Aziz forced the issue of not paying him for the business that he was starting to bring in.

286.    Aziz said the business Mr. Daratony brought in wasn't enough, and he needed to go.

287.    Aziz moved the goalpost on him, too, and Mr. Daratony was forced to resign.

288.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring.  He also complained to HR about what he viewed as unethical breaches of contracts which made him look terrible to his employees and members of this industry.

**Whitney Vancleave**

289.    Mr. Osso also inherited Whitney VanCleave ("Ms. VanCleave").

290.    She was the longest-tenured employee at about 5 years.

291.    She was very nice and professional.  She had some business but was not growing it.

292.    Aziz gave her perfect marks and a $5000 bonus each month.

293.    Ms. VanCleave went on maternity leave, and Mr. Osso was required to hire a temp to manage her business while she was out.

294.    Aziz had offered Ms. VanCleave paid time off for maternity leave and then changed his mind about how they would do it.

295.    Ms. VanCleave was frustrated and came to Mr. Osso for help.

296.    Eventually, HR was involved, and it was resolved per what Aziz initially promised.

297.    When she returned, in spite of the fact that she the ground running, Aziz changed her compensation plans and pay-outs.  This was a clear act of retaliation for Ms. VanCleave taking maternity leave, and it was also a clear breach of contract as Aziz failed to provide any consideration for the new employment terms.

298.    As a result of Aziz, Ms. VanCleave was forced to resign in protest.

299.    Mr. Osso complained to human resources, informing them that he did not feel comfortable engaging in the discriminatory practices Aziz was requiring.  He also complained to HR about what he viewed as the unethical breaches of contracts which made him look terrible to his employees and members in this industry.

300.    Ultimately, Aziz and Chris engaged in discriminatory practices for hiring and or firing reps and, as such, put Mr. Osso in a situation where his reputation and ethics were challenged since Mr. Osso did not agree with firing these folks.

## COUNT ONE
## Breach Of Contract
## (Virginia Lee)

301.    Plaintiff Lee repeats and realleges the allegations outlined in all previous paragraphs of this Complaint as if they were outlined in full herein.

302.    To establish a breach of contract claim, our law imposes on a plaintiff the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the Plaintiff [s]."v[*Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482, 139 A.3d 57 (2016) (alterations in original) (quoting *Model Jury Charges (Civil)* § 4.10A "The Contract Claim-Generally" (approved May 1998)).]  Carifi v. Barberio, No. A-0597-17T1, 2020 N.J. Super.  Unpub. LEXIS 2393, at *22 (Super. Ct. App. Div. December 14, 2020).

303.    Plaintiff Lee was in contract with the defendant corporation to utilize her experience, knowledge, and networks to build the Defendants business.

304.    Plaintiff Lee fully executed her duties under the contract when she used her knowledge, networks, and reputations to bring business contracts and orders to the Defendants boosting the services the defendants provided.

305.    In exchange for her services, the Plaintiff Lee was guaranteed a set salary and set bonus.

306.    Ms. Lee informed Defendants that she made $300k per year and demanded at least 175k base to work for them.  Defendants agreed.



Text message with Defendant Weidman Agreeing to Pay Plaintiff Lee, a base salary of $175,000.00.

307.    As part of their negotiation, Defendant Lee made it very clear that she would not leave the job she had to work for Defendants unless they give her an offer, she could "not refuse" because she did not want to burn bridges.  The sales industry is very small, and Ms. Lee has a vast network and positive reputation. It would be career suicide for her to abruptly leave a competitor unless she was leaving for a significant amount of money.



Defendant Weidman acknowledge Ms. Lee's concerns about receiving significant compensation to leave her employer to come to Defendants corporation.

308.    Defendant Weidman promised Ms. Lee everything under the sun to get her to leave a job where she was making over 300k per year to work for Defendants.





**Left screen:**

I'm going to give you your first month's commission at four right. So remember you're going to get $7500 to not even bring me on any business and month one

Anything you could do like that. This is literally the worst time to buy a car in the history of car buying

Full rate

I'm a car guy
Volkswagen TDI diesel

I will look at it. My option is a Suburban or that Jeep. Neither are good. 😂

Used and cheap a good mpg

All about used.

So let me write this all back to you....so you can tell me if I am on the same page:

**Right screen:**

All about used.

So let me write this all back to you....so you can tell me if I am on the same page:

Ok

-185k...base
-90k bonus at plan....7500 "bridge" for first month (if I started like next week, that's mid-May, so then what?)
-10k sign on (pay back if leave before day 366)
-15k retention on day 366
-401k match at 4% on day 366
-500/mo car allowance
-Gas paid

Yes except I'm not gonna make you pay anything back

I'm not leaving

Okay. Would I start next week?



309.   Chris Weidman Informed Plaintiff Lee that Defendants had the HCA client.  That was a lie.

310.   Chris Weidman agreed to pay Plaintiff Lee a sign on and yearly bonus. That was a lie.

311.   Chris Weidman agreed to pay Plaintiff Lee for her car, internet, and gas.  That was a lie.

312.   Chris Weidman implemented a bait and switch on Plaintiff Lee and reneged on everything he had previously agreed to do as evidenced by the messages above.

313.    Plaintiff Lee was hired to bring on 25 cases at HCA (the account they never had). That is why Plaintiff Lee took the job.

314.    When Plaintiff Lee onboarded, and resigned from her prior employer, Defendants put Plaintiff Lee in the field to work a regular territory instead.  That was a job that Plaintiff Lee would have never taken because no one could have taken business from existing providers.

315.    Acquiring 25 cases was impossible for anybody in Plaintiff Lee's territory but not for the role Plaintiff Lee thought she was taking implementing HCA.

316.    Plaintiff Lee executed her requirements of the contract by implementing Salesforce.

317.    Plaintiff Lee complained about this breach of contract to Defendant executive Eltawil.

318.    Plaintiff Lee worked for defendants for a total of 13 months.  Plaintiff Lee earned all of her bonuses and other incentives.

319.    Defendant's failure to execute their obligations fully and faithfully under the contract when they reneged on Plaintiff Lees contractually guaranteed salary, reneged on Plaintiff Lees contractually guaranteed bonus structure and stole Plaintiff Lees network and business contracts.

320.    As a result of the defendant's negligence, the Plaintiff Lee has had her reputations damaged in the industry, Plaintiff Lee lost employment opportunities in the industry, Plaintiff Lee lost her bonus, and Plaintiff Lee was wrongfully terminated from the Defendant corporation.

**WHEREFORE,** Plaintiff Lee demands judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted. Awarding compensatory damages; awarding punitive damages; awarding costs and fees of this action, including attorneys' fees to the extent permitted by law; awarding prejudgment interest to the extent permitted by law; and awarding such other and further relief as to this Court may seem proper.

## COUNT TWO
## Fraud
## (Virginia Lee)

321.    Plaintiff Lee repeat and reallege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

322.    The elements of fraud in the inducement are a misrepresentation of material fact; knowledge or belief by the defendant of its falsity; intent that the other party relies on the misrepresentation; and reasonable reliance thereon by the other party. *Nolan v. Lee Ho*, 120 N.J. 465, 472, 577 A.2d 143 (1990). Fraud in the inducement does not differ materially from

common-law fraud, as it provides a cognizable basis for equitable relief in the event a false promise induced reliance. *See Lipsit v. Leonard*, 64 N.J. 276, 283, 315 A.2d 25 (1974). *Longmuir v. Kickin' It*, No. A-0422-18T2, 2020 N.J. Super.  Unpub. LEXIS 707, at *6 (Super. Ct. App. Div. April 21, 2020).

Misrepresentation of Material Fact:

323.    Here, as detailed above, Defendant presented Plaintiff Lee with employment contracts detailing compensation structures, bonus structures, reimbursements for out-of-pocket expenses and specific terms of employment that Plaintiff Lee relied upon to her detriment.

324.    On multiple occasions throughout the duration of her employment, Defendants changed Plaintiff Lee's compensation structure by reducing Plaintiff Lee's compensation, changing Plaintiff Lee's expense reimbursements, and failed to pay Plaintiff Lee her guaranteed bonuses as detailed in count one above.

325.    Throughout the duration of her employment, Defendants changed the bonus structure by consistently changing the metrics and standards that were required to be met to earn bonuses.

326.    Throughout the duration of her employment, Plaintiff Lee was required to incorporate her network and years of experience into Defendant's organization with the guarantee that Plaintiff Lee would maintain and nurture those relationships.

327.    After Plaintiff Lee complied, Plaintiff Lee was stripped of her territories, clients, and business portfolios and had them reassigned to younger, junior, less experienced individuals.

328.    An objectionably reasonable person in Plaintiff Lees position would believe the compensation structure, bonus structure, and terms of employment detailed in her employment agreement would be adhered to by Defendants.

The Defendants Knew Their Representations To Plaintiff Lee In Plaintiff Lees Employment Contract Was False:

329.    Here, Defendants knew representations to Plaintiff Lee in Plaintiff Lee's employment agreement was false when they repeatedly reneged on all aspects of the employment agreement.

330.    Defendants knew the role Plaintiff Lee was being hired for (HCA) did not exist and was not a possibility for at least 12-18 months post-hire.

331.    Defendant Chris Weidman was compensated to employ Plaintiff Lee, a conflict of interest in providing accurate information to attract talent.  He never disclosed this to Plaintiff Lee.



332.    Defendants robbed Plaintiff Lee of her ability to reject Defendants' offer of employment prior to devoting her time, resources, and network to building Defendants' business.

333.    Defendants waited until Plaintiff Lee was fully immersed and invested in Defendant's corporation before they stripped Plaintiff Lee of her compensation, bonus, clients, and network.

334.    Throughout her employment, Defendants fed Plaintiff Lee with a bag of lies concerning guaranteed compensation, guaranteed bonuses, business profitability, and reimbursement for out-of-pocket expenses.

Plaintiff Detrimentally Relied On Defendants Promise:

335.    Here, the Plaintiff Lee worked in the Defendants industry for an average of fifteen years.

336.    Plaintiff Lee has worked for a myriad of competitors and understand the basic patterns and practices of corporations that provided the same services as Defendants within the Defendants industry.

337.    Plaintiff Lee detrimentally relied upon Defendants, to be honest and truthful in their representations to her.  Defendants intentionally deceived Plaintiff Lee for the sole purpose of getting her to use her network, years of experience, and reputation with her clients to build Defendants' business.

Plaintiff Lees Detrimental Reliance was Reasonable:

338.    Here, as previously stated, Plaintiffs' detrimental reliance was reasonable because she worked in this industry on average for at least ten years and had no reason to believe that Defendants would deviate from industry employment standards by using her for her network and resources and by reneging on her employment agreements by reducing her salary and altering the contracted bonus structures.

**WHEREFORE,** Plaintiff Lee demand judgment of restitution, indemnity, contribution, or apportionment of responsibility from the party or parties against whom this claim is asserted. Awarding compensatory damages; awarding punitive damages; awarding costs and fees of this action, including attorneys' fees to the extent permitted by law; awarding prejudgment interest to the extent permitted by law; and awarding such other and further relief as to this Court may seem proper.

**COUNT THREE**
**Violations of the Conscientious Employee Protection Act**
**(New Jersey Invasion of Privacy and Federal HIPAA Violations**
**Virginia Lee, Eric Hildebrandt, Samantha Libby, Laina Dutton)**

339.    Plaintiff Lee, Hildebrandt, Libby, and Dutton repeat and re-allege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

340.    During their employment, the Plaintiffs learned that Defendant was engaging in rampant violations of New Jersey state privacy and federal HIPAA laws.

341.    Plaintiff complained about those violations to the defendant's officers Defendant Aziz, Defendant Khan, and COO Bing Li.

342.    In retaliation, the Plaintiffs suffered adverse employment actions while all other employees continued to work their normal schedules, were allowed to maintain their clients, and were compensated in accordance with their employment agreement.

343.    The Privacy and HIPAA laws at issue are clearly established worker and consumer protection statutes with their own respective regulations and constitute a clear mandate of public policy under the New Jersey Conscientious Employee Protection Act.

344.    The plaintiffs believed they were reporting a clear violation of federal and New Jersey laws, rules, regulations, and public policy to upper-level management.

345.    By reporting those violations, the Plaintiffs were also refusing to participate in an activity they reasonably believed was illegal and in violation of Federal and New Jersey laws, rules, regulations, and clear mandates of public policy.

346.    Therefore, Plaintiffs engaged in protected activity under the New Jersey Conscientious Employee Protection Act.

347.    In retaliation, Defendant inflicted the above-stated adverse employment actions on Plaintiff.

348.    Defendant retaliated against Plaintiffs with one or more adverse employment actions in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq.

349.    The upper-level managers of Defendants knew or should have known about the retaliatory and adverse employment actions taken against Plaintiffs, and rather than stop it, allowed it to happen and participated in it.

350.    In fact, Defendant used a grossly incompetent external human resources "partner" to wrongfully terminate and or retaliate against the Plaintiffs.

351.    Plaintiffs suffered and continues to suffer emotional distress, upset, and humiliation due to their wrongful terminations and or reduction of her hours.

352.    Plaintiffs suffered and continues to suffer financial loss due to the reduction of their hours.

353.    In addition, the financial loss contributes to Plaintiff's distress, upset, and humiliation.

354.    Plaintiffs suffer financial loss due to damaged reputation and lack of trust stemming from working with an organization which placed their respective organizations at such large risk.

355.    Lastly, the intentional and malicious actions of Defendant, including its owners and upper-level managers, justify the imposition of punitive damages.

**WHEREFORE**, The Plaintiffs demand judgment against Defendants jointly, severally, and in the alternative, for damages; losses; emotional harm, embarrassment, and upset; psychological injuries; interest; costs; equitable relief; injunctive relief; reinstatement; attorneys' fees; costs of suit; experts' fees; punitive damages; any and all relief provided for by the applicable state laws; and any and all relief that the Court deems just and proper.

## COUNT FOUR
### (Age Discrimination)
### (Plaintiffs against Defendants)

356.    Plaintiffs repeat and re-allege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

357.    At all times material hereto, Plaintiffs were employed by Defendant and efficiently performed their jobs well.

358.    Plaintiffs' co-workers and upper-level managers were aware of Plaintiffs Age.  During their employment Plaintiffs were all over the age of 40.


**Hank Swank**:

359.    Plaintiff Swank brings his claims pursuant to the state law of California.  Mr. Swank worked as a sales representative for Defendants in the aforementioned state and suffered the harm detailed herein by the defendants in that state.

360.    Mr. Swank is over the age of 40 years old and is a member of the protected class as defined by the California state statute.

361.    Mr. Swank notified Defendants of his concerns regarding their acts of age discrimination. Mr. Swank complained to his manager, as well as to other supervisors and directors of defendant's organization.

362.    Mr. Swank raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

363.    Mr. Swank was qualified for his position, and consistently executed the essential functions of his job.

364.    Mr. Swank had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole and exploited.

365.    Mr. Swanks claims are timely filed pursuant to California's statute of limitations.


**Mike McDonough**:

366.    Plaintiff McDonough brings his claims pursuant to the state law of New York.  Mr. McDonough worked as a sales representative for Defendants in the aforementioned state and suffered the harm detailed herein by the defendants in that state.

367.   Mr. McDonough is over the age of 40 years old and is a member of the protected class as defined by the New York state statute.

368.   Mr. McDonough notified Defendants of his concerns regarding their acts of age discrimination.

369.   Mr. McDonough complained to his manager, as well as to other supervisors and directors of defendant's organization.

370.   Mr. McDonough raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

371.   Mr. McDonough was qualified for his position, and consistently executed the essential functions of his job.

372.   Mr. McDonough had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

373.   Mr. McDonough's claims are timely filed pursuant to New York State and New York City's statute of limitations.


**AJ Holderman**:

374.   Plaintiff Holderman brings his claims pursuant to the state laws of Ohio, and Michigan. Mr. Holderman worked as a sales representative for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

375.   Mr. Holderman is over the age of 40 years old and is a member of the protected class as defined by the Ohio and Michigan state statute.

376.   Mr. Holderman notified Defendants of his concerns regarding their acts of age discrimination.

377.   Mr. Holderman complained to his manager, as well as to other supervisors and directors of defendant's organization.

378.   Mr. Holderman raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

379.   Mr. Holderman was qualified for his position, and consistently executed the essential functions of his job.  Mr. Holderman had over ten years of experience and proven relationships

within his assigned territories which Defendants used, stole, and exploited.

380.    Mr. Holderman's claims are timely filed pursuant to Ohio and Michigans statute of limitations.

**Erik Hildebrandt**:

381.    Plaintiff Hildebrandt brings his claims pursuant to the state laws of Florida and New Jersey. Mr. Hildebrandt worked as a sales representative for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

382.    Mr. Hildebrandt is over the age of 40 years old and is a member of the protected class as defined by the Florida and New Jersey state statutes.

383.    Mr. Hildebrandt notified Defendants of his concerns regarding their acts of age discrimination.

384.    Mr. Hildebrandt complained to his manager, as well as to other supervisors and directors of defendant's organization.

385.    Mr. Hildebrandt raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

386.    Mr. Hildebrandt was qualified for his position, and consistently executed the essential functions of his job.

387.    Mr. Hildebrandt has over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

388.    Mr. Hildebrandt's claims are timely filed pursuant to Florida and New Jersey's statute of limitations.

**Paul Christian Burk**:

389.    Plaintiff Burk brings his claims pursuant to the state laws of Illinois, and New Jersey. Mr. Burk worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

390.    Mr. Burk is over the age of 40 years old and is a member of the protected class as defined by the Illinois, New Jersey state statute.

391.    Mr. Burk notified Defendants of his concerns regarding their acts of age discrimination.

Mr. Burk complained to his manager, BJ Osso as well as to other supervisors and directors of defendant's organization.

392.    Mr. Burk raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

393.    Mr. Burk was qualified for his position, and consistently executed the essential functions of his job.  Mr. Burk had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

394.    Mr. Burk's claims are timely filed pursuant to Illinois statute of limitations and New Jerseys' statute of limitations.


**Laina Dutton**:

395.    Plaintiff Dutton brings her claims pursuant to the state laws of Louisiana, and New Jersey. Ms. Dutton worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

396.    Ms. Dutton is over the age of 40 years old and is a member of the protected class as defined by the Louisiana, New Jersey state statute.

397.    Ms. Dutton notified Defendants of her concerns regarding their acts of age discrimination. Ms. Dutton complained to her manager, as well as to other supervisors and directors of defendant's organization.

398.    Ms. Dutton raised concerns regarding the fact that her territories were being stripped from her and handed over to less experienced female and male sales representatives who were all under the age of 40.

399.    Ms. Dutton was qualified for her position, and consistently executed the essential functions of her job.

400.    Ms. Dutton had over ten years of experience and proven relationships within her assigned territories which Defendants used, stole, and exploited.

401.    Ms. Dutton's claims are timely filed pursuant to Louisiana and New Jerseys statute of limitations.


**Lawrence LaMaina**:

402.    Plaintiff LaMaina brings his claims pursuant to the state law of New Jersey.  Mr. LaMaina worked as a sales specialist for Defendants in the aforementioned state and suffered the harm detailed herein by the defendants in those states.

403.    Mr. LaMaina is over the age of 40 years old and is a member of the protected class as defined by the New Jersey state statute.

404.    Mr. LaMaina notified Defendants of his concerns regarding their acts of age discrimination.

405.    Mr. LaMaina complained to his manager as well as to other supervisors and directors of defendant's organization.

406.    Mr. LaMaina raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

407.    Mr. LaMaina was qualified for his position, and consistently executed the essential functions of his job.  Mr. LaMaina had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

408.    Mr. LaMaina's claims are timely filed pursuant to New Jerseys statute of limitations.

**Samantha Libby**:

409.    Plaintiff Libby brings her claims pursuant to the state laws of New Jersey.  Ms. Libby worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

410.    Ms. Libby is over the age of 40 years old and is a member of the protected class as defined by the New Jersey state statute.

411.    Ms. Libby notified Defendants of her concerns regarding their acts of age discrimination.  Ms. Libby complained to her manager, as well as to other supervisors and directors of defendant's organization.

412.    Ms. Libby raised concerns regarding the fact that her territories were being stripped from her and handed over to less experienced female and male sales representatives who were all under the age of 40.

413.    Ms. Libby was qualified for her position, and consistently executed the essential functions of her job.  Ms. Libby had over ten years of experience and proven relationships within her

assigned territories which Defendants used, stole, and exploited.

414. Ms. Libby's claims are timely filed pursuant to New Jerseys statute of limitations.


**Virginia Lee**:

415. Plaintiff Lee brings her claims pursuant to the state law of Tennessee and New Jersey. Ms. Lee worked as a sales specialist for Defendants in the aforementioned state and suffered the harm detailed herein by the defendants in those states.

416. Ms. Lee is over the age of 40 years old and is a member of the protected class as defined by the Tennessee and New Jersey state statutes.

417. Ms. Lee notified Defendants of her concerns regarding their acts of age discrimination. Ms. Lee complained to her manager as well as to other supervisors and directors of defendant's organization.

418. Ms. Lee raised concerns regarding the fact that she was hired to bring on 25 cases at HCA (the account they never had), yet when they got the accounts, they assigned it to younger, less experienced employees.

419. When Plaintiff Lee onboarded, and resigned from her prior employer, Defendants put Plaintiff Lee in the field to work a regular territory instead.

420. That was a job that Plaintiff Lee would have never taken because no one could have taken business from existing providers.

421. Plaintiff Lee's experience and expertise would have been better served in the position she was recruited to do, as opposed to the position that they baited and switched her into.

422. Upon information and belief, Defendants placed several employees that are younger than 40 years old in the position Plaintiff Lee was contracted to be in.

423. Ms. Lee's claims are timely filed pursuant to New Jerseys' statute of limitations. Ms. Lee has filed with the EEOC and has satisfied Tennessee administrative process requirement.


**Tim Mariakakis**:

424. Plaintiff Mariakakis brings her claims pursuant to the state laws of Louisiana, and New Jersey. Mr. Mariakakis worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

425. Mr. Mariakakis is over the age of 40 years old and is a member of the protected class as

defined by the Connecticut, New Jersey state statute.

426.    Mr. Mariakakis notified Defendants of his concerns regarding their acts of age discrimination.

427.    Mr. Mariakakis complained to his manager, as well as to other supervisors and directors of defendant's organization.

428.    Mr. Mariakakis raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

429.    Mr. Mariakakis was qualified for his position, and consistently executed the essential functions of his job.

430.    Mr. Mariakakis had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

431.    Mr. Mariakakis's claims are timely filed pursuant to Connecticut and New Jerseys statute of limitation.

**Lindsey Forbus**:

432.    Plaintiff Forbus brings her claims pursuant to the state laws of New Jersey.  Ms. Forbus worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

433.    Ms. Forbus is over the age of 40 years old and is a member of the protected class as defined by the New Jersey state statute.

434.    Ms. Forbus notified Defendants of her concerns regarding their acts of age discrimination. Ms. Forbus complained to her manager, as well as to other supervisors and directors of defendant's organization.

435.    Ms. Forbus raised concerns regarding the fact that her territories were being stripped from her and handed over to less experienced female and male sales representatives who were all under the age of 40.

436.    Ms. Forbus was qualified for her position, and consistently executed the essential functions of her job.  Ms. Forbus had over ten years of experience and proven relationships within her assigned territories which Defendants used, stole, and exploited.

437.    Ms. Forbus claims are timely filed pursuant to New Jerseys statute of limitations.

**<u>Edward Dix</u>**:

438.    Plaintiff Dix brings his claims pursuant to the state laws of California, and New Jersey. Mr. Dix worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

439.    Mr. Dix is over the age of 40 years old and is a member of the protected class as defined by the California and New Jersey state statute.

440.    Mr. Dix notified Defendants of his concerns regarding their acts of age discrimination. Mr. Dix complained to his manager, as well as to other supervisors and directors of defendant's organization.

441.    Mr. Dix raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

442.    Mr. Dix was qualified for his position, and consistently executed the essential functions of his job.

443.    Mr. Dix had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

444.    Mr. Dix's claims are timely filed pursuant to California and New Jerseys' statute of limitation.

**<u>John Berry</u>**:

445.    Plaintiff Berry brings his claims pursuant to the state laws of New Jersey. Mr. Berry worked as a sales specialist for Defendants in the aforementioned state and suffered the harm detailed herein by the defendants in that state.

446.    Mr. Berry is over the age of 40 years old and is a member of the protected class as defined by the New Jersey state statute.

447.    Mr. Berry notified Defendants of his concerns regarding their acts of age discrimination. Mr. Berry complained to his manager, as well as to other supervisors and directors of defendant's organization.

448.    Mr. Berry raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all

under the age of 40.

449.    Mr. Berry was qualified for his position, and consistently executed the essential functions of his job.

450.    Mr. Berry had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

451.    Mr. Berry's claims are timely filed pursuant to New Jerseys statute of limitation.

**Ryan Miller**:

452.    Plaintiff Miller brings his claims pursuant to the state laws of New Jersey.  Mr. Miller worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

453.    Mr. Miller is over the age of 40 years old and is a member of the protected class as defined by the New Jersey state statute.

454.    Mr. Miller notified Defendants of his concerns regarding their acts of age discrimination. Mr. Miller complained to his manager, as well as to other supervisors and directors of defendant's organization.

455.    Mr. Miller raised concerns regarding the fact that his territories were being stripped from him and handed over to less experienced female and male sales representatives who were all under the age of 40.

456.    Mr. Miller was qualified for his position, and consistently executed the essential functions of his job.

457.    Mr. Miller had over ten years of experience and proven relationships within his assigned territories which Defendants used, stole, and exploited.

458.    Mr. Miller's claims are timely filed pursuant to New Jerseys' two-year statute of limitation.

459.    From on or about 2021 to present day, the Plaintiffs put Defendant's upper-level managers on notice in person and in writing of the age discrimination and/or age-related harassment they suffered in the workplace.

460.    As stated above, BJ Osso was a part of the management team, and he was instructed by the individual defendants to terminate Plaintiffs due to their age.  Mr. Osso is prepared to testify to the same.

461.    Mr. Osso was in the staffing meetings and has firsthand knowledge of Defendant Weidman

and Aziz's plan to recruit experienced salesmen and women, promise them high salaries and bonuses, have them set up their networks, bring all of their business and contracts, and then terminate them and replace them with "young, hot female sales specialist."

462.  Once Plaintiffs complained that their rights and protections against age discrimination and age-based harassment were being violated and/or that they were taking steps to oppose their practices and acts, Defendant terminated Plaintiff's employment in retaliation.

463.  The upper-level managers of Defendant knew or should have known about the discrimination and retaliation against, and termination of, Plaintiffs and, rather than stop it, allowed it to happen and participated in it.

464.  In fact, Defendant used a grossly incompetent external human resources "partner" to wrongfully terminate and or retaliate against the Plaintiffs.

465.  Plaintiffs suffered and continue to suffer emotional distress, upset, and humiliation due to discrimination, retaliation, and wrongful termination.

466.  Plaintiffs suffered and continue to suffer financial loss due to discrimination, retaliation, and wrongful termination.

467.  In addition, the financial loss contributes to Plaintiff's distress, upset, and humiliation.

468.  Lastly, the intentional and malicious actions of Defendants justify the imposition of punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment against Defendants jointly, severally, and in the alternative, for damages; losses; emotional harm, embarrassment and upset; psychological injuries; interest; costs; equitable relief; injunctive relief; reinstatement; attorneys' fees; costs of suit; experts' fees; punitive damages; any and all relief provided for by the applicable state laws; and any and all relief that the Court deems just and proper.

## COUNT FIVE
### (Disability Discrimination)
### (Laina Dutton, Samantha Libby, AJ Holderman, and Virginia Lee)

469.  Plaintiff Lee, Holderman, Taylor, Libby, and Dutton repeat and re-allege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

470.  At all times material hereto, Plaintiffs were employed by Defendant and efficiently performed their job well.

471.  Plaintiff's co-workers and upper-level managers were aware of Plaintiff's disabilities.

**AJ Holderman (Ohio, Michigan)**:

472.    Plaintiff Holderman brings his claims pursuant to the state laws of Ohio, and Michigan. Mr. Holderman worked as a sales representative for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

473.    Mr. Holderman was a disabled employee as defined by the Michigan and Ohio state statute. Mr. Holderman notified Defendants of his disability through conversations with his direct supervisor. Mr. Holderman requested reasonable accommodations and was denied. Mr. Holderman was qualified for his position, and consistently executed the essential functions of his job with or without the accommodations.

474.    Mr. Holderman's claims are timely filed pursuant to Ohio's two-year statute of limitations and Michigan's three-year statue of limitations.


**Virginia Lee (Tennessee, New Jersey)**:

475.    Plaintiff Lee brings her claims pursuant to the state laws of Tennessee, and New Jersey. Ms. Lee implemented hospital systems for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

476.    Ms. Lee was a disabled employee as defined by the Tennessee and New Jersey state statute. Ms. Lee notified Defendants of her disability through conversations with her direct supervisor. Ms. Lee requested reasonable accommodations and was denied. Ms. Lee went on disability leave and was terminated within months of returning to work. Ms. Lee was qualified for her position, and consistently executed the essential functions of her job with or without the accommodations.

477.    Ms. Lees claims are timely filed pursuant to Tennessee's one year statute of limitations and New Jerseys' two-year statue of limitations.


**Laina Dutton (Louisiana, New Jersey)**:

478.    Plaintiff Dutton brings her claims pursuant to the state laws of Louisiana, and New Jersey. Ms. Dutton worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

479.    Ms. Dutton was a disabled employee as defined by the Louisiana and New Jersey state statute. Ms. Dutton notified Defendants of her disability through conversations with her direct supervisor. Ms. Dutton requested reasonable accommodations and was denied. Ms. Dutton

went on disability leave and was terminated within months of returning to work.  Ms. Dutton was qualified for her position, and consistently executed the essential functions of her job with or without the accommodations.

480.    Ms. Duttons claims are timely filed pursuant to Louisiana's one year statute of limitations and New Jerseys' two-year statute of limitations.

**Samantha Libby (New Jersey)**:

481.    Plaintiff Libby brings her claims pursuant to the state laws of North Carolina, and New Jersey.  Ms. Libby worked as a sales specialist for Defendants in the aforementioned states and suffered the harm detailed herein by the defendants in those states.

482.    Ms. Libby was a disabled employee as defined by the North Carolina and New Jersey state statute.  Ms. Libby notified Defendants of her disability through conversations with her direct supervisor.  Ms. Libby requested reasonable accommodations and was denied.  Ms. Libby went on disability leave and was terminated within months of returning to work.  Ms. Libby was qualified for her position, and consistently executed the essential functions of her job with or without the accommodations.

483.    Ms. Libby's claims are timely filed pursuant to North Carolina's one year statute of limitations and New Jerseys' two-year statute of limitations.

484.    From on or about March 2022, the Plaintiffs put Defendant's upper-level managers on notice, via email, test messages and through in person conversations, of their disability discrimination and/or disability-related harassment/retaliation they suffered in the workplace.

485.    Once Plaintiffs complained that their rights and protections against disability discrimination and disability-based harassment were being violated and/or that they were taking steps to oppose their practices and acts, Defendant terminated Plaintiff's employment in retaliation.

486.    Defendant discriminated against, retaliated against, and terminated Plaintiffs in violation of the laws of the states detailed above.

487.    The upper-level managers of Defendant knew or should have known about the discrimination and retaliation against, and termination of, Plaintiffs and, rather than stop it, allowed it to happen and participated in it.

488.    In fact, Defendant used a grossly incompetent external human resources "partner" to

wrongfully terminate and or retaliate against the Plaintiffs.

489.   Plaintiffs suffered and continue to suffer emotional distress, upset, and humiliation due to discrimination, retaliation, and wrongful termination.

490.   Plaintiffs suffered and continue to suffer financial loss due to discrimination, retaliation, and wrongful termination.

491.   In addition, the financial loss contributes to Plaintiff's distress, upset, and humiliation.

492.   Lastly, the intentional and malicious actions of Defendants justify the imposition of punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment against Defendants jointly, severally, and in the alternative, for damages; losses; emotional harm, embarrassment and upset; psychological injuries; interest; costs; equitable relief; injunctive relief; reinstatement; attorneys' fees; costs of suit; experts' fees; punitive damages; any and all relief provided for by the applicable state laws; and any and all relief that the Court deems just and proper.

## COUNT SIX
### AIDING AND ABETTING AGAINST INDIVIDUAL DEFENDANTS
### (Laina Dutton, Samantha Libby, AJ Holderman, and Virginia Lee)

493.   Plaintiffs Libby, Lee, Holderman, Dutton, and Taylor repeat and re-allege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

494.   It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter or attempt to do so.

495.   Plaintiff Libby, Lee, Holderman, Dutton, and Taylor participated in protected activity by complaining to upper management and contacting human resources for violating their disability rights, breaching their employment contracts, discriminating against them in their wages, and for discriminating against them due to their age and national origin.

496.   After doing so, Plaintiffs allege individual defendants took several adverse employment actions against them, including, among other things, being written up and subjected to heightened scrutiny of their work product, denying them contractual raises, and bonuses, demoting them, publicly chastising and embarrassing them due to their age, and or disabilities, and terminating them or forcing them to leave the organization after they participated in an internal investigation.

497.   Aziz implemented these acts and directed Defendant Weidman and former employee BJ Osso to execute them.

498.   Their temporal proximity evidence the causal connection between the protected activity

and the adverse employment actions.

499.    As their supervisors and or manager, individual defendants engaged in the egregious prohibited conduct listed above.  This egregious prohibition led to a retaliatory termination and constructive discharge.

500.    Defendants' actions and omissions warrant an award of punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment against Defendants jointly, severally, and in the alternative, for damages; losses; emotional harm, embarrassment and upset; psychological injuries; interest; costs; equitable relief; injunctive relief; reinstatement; attorneys' fees; costs of suit; experts' fees; punitive damages; any and all relief provided for by the applicable state laws; and any and all relief that the Court deems just and proper.

<u>**COUNT SEVEN**</u>
**SEXUAL HARASSMENT**
**(Plaintiff Forbus against Defendant Weidman)**

501.    Plaintiff Forbus repeat and re-allege the allegations set forth in all previous paragraphs of this Complaint as if they were set forth in full herein.

502.    Sexual harassment based on a hostile work environment exists "where there are sexual advances, fondling or a sexually suggestive workplace atmosphere that the claimant finds unwelcome." <u>Walker v. Sullair Corp</u>*.,* 736 F.Supp. 94, 100 (W.D.N.C. 1990). "Hostile work environment is characterized by a workplace 'pervaded with sexual slur, insult and innuendo, … verbal sexual harassment, … or extremely vulgar and offensive sexually related epithets' directed to or about an employee." <u>Id</u>. (quoting *Katz,* 709 F.2d at 254). <u>Kidwell v. Sheetz, Inc</u>*.,* 982 F. Supp. 1177, 1182 (W.D. Va. 1997) 1179-80.  <u>Taylor v. Wee Health Care Servs</u>., Civil Action No. 09-4034(FLW), 2010 U.S. Dist. LEXIS 26020, at \*7-8 (D.N.J. Mar. 19, 2010).

503.    As detailed above, on multiple occasions Defendant Weidman made unwanted sexual advances towards his subordinate, Plaintiff Forbus.

504.    Ms. Forbus has many unwanted messages, text messages and in person conversations where Defendant Weidman came onto her.  When Ms. Forbus rejected his advances, Mr. Weidman became hostile and began to pick apart Ms. Weidman's work product.

505.    Mr. Weidman's harassment and retaliation became so bad, that he threatened to place her on a Performance Improvement Plan with the intent to terminate Ms. Forbus.

506.    The depression and severe anxiety attached to Defendants Weidman's unwanted sexual advances.  Ms. Forbus developed serious health concerns and required medical attention.

507. Ms. Forbus was so ill that she requested medical leave. In an act of retaliation for denying his sexual advances, Mr. Weidman rejected Ms. Forbus medical leave, and he was instrumental in Ms. Forbus being terminated.

508. Defendants' actions and omissions warrant an award of punitive damages.

**WHEREFORE**, the Plaintiffs demand judgment against Defendants jointly, severally, and in the alternative, for damages; losses; emotional harm, embarrassment and upset; psychological injuries; interest; costs; equitable relief; injunctive relief; reinstatement; attorneys' fees; costs of suit; experts' fees; punitive damages; any and all relief provided for by the applicable state laws; and any and all relief that the Court deems just and proper.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

a) For past, present, and future general damages in an amount to be determined at trial;
b) For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;
c) Any appropriate statutory damages;
d) For costs of suit;
e) For interest as allowed by law;
f) For attorney's fees; and
g) For such other and further relief as the Court may deem proper.

Dated: January 5, 2024
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

### JURY DEMAND

According to <u>R</u>. 4:35-1, Plaintiff hereby demands a trial by jury as to all issues.

Dated: January 5, 2024
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## DEMAND FOR INSURANCE

According to R. 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in their action or to indemnify or reimburse for payments made to satisfy the judgment.

Dated: January 5, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## DESIGNATION OF TRIAL COUNSEL

According to R. 4:25-4, Tyrone A. Blackburn, Esq. is hereby designated trial counsel.

Dated: January 5, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## CERTIFICATION

According to R. 4:5-1, the undersigned certifies that the matter in controversy is not the subject of any other action pending in any other court or a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated, and all known, necessary parties have been joined in their action.

Dated: January 5, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the Defendants, and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. You are directed from this point forward to prevent any "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any of the information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.

Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form, along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is quickly deleted, modified, or corrupted. Accordingly, the demand is made that you take every reasonable step to preserve this information until the final resolution of this matter.

72

This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this letter's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: January 5, 2024

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.